STUART v. STUART.

1. Divorce—Extreme Cruelty—Evidence.
In suit by wife for divorce, where evidence shows that defendant was guilty of extreme cruelty plaintiff was entitled to decree granting divorce, notwithstanding her own conduct was not to be approved.

2. Same—Bonds—Support of Children—Trust Funds—Statutes.
Statute authorizing that bond be required to assure payments of allowance for children does not expressly authorize requirement that moneys be paid into a trust fund, hence provision of decree requiring $100 a month be paid into trust fund for indefinite future needs is stricken (3 Comp. Laws 1929, § 12738).

Appeal from Wayne; Jayne (Ira W.), J. Submitted October 5, 1944. (Docket No. 65, Calendar No. 42,874.) Decided April 9, 1945.

Bill by Elizabeth J. Stuart against Homer B. Stuart for divorce on ground of extreme cruelty. Cross bill by defendant against plaintiff to obtain right of visitation and to set allowance for support of children. Decree for plaintiff. Defendant appeals. Modified and affirmed. -

*Robert O. Brown,* for plaintiff.

*Buckingham, Piggins & Rehn (Carroll C. Grigsby,* of counsel), for defendant.

REID, J. Defendant appeals from a decree granting plaintiff a divorce. Defendant's cross bill asked for certain incidental relief, but did not pray for a divorce. The parties live in the city of Detroit and were married there, August 4, 1934. Defendant was then 31 years of age and plaintiff 18. They have 2 children, 5 and 2 years of age.

Plaintiff among other things complained in particular of three occasions on which the defendant gave her a very severe beating. After the first occasion she left him and again after the second occasion, but they became reconciled and resumed their marriage relations. The three occasions were in February, 1936, March, 1940, and March 15, 1942.

The following is from plaintiff's testimony:

"I left Mr. Stuart because he beat me several times, and the last time I decided it was enough. That was the morning of March 15, 1942. At that time he struck me several times and bruised me bodily. He knocked me down and kicked me while I was on the bathroom floor. I had black and blue marks, a black eye and swollen nose as a result. The trouble started in the car and was finished at home. The lady next door called the police. I was badly bruised.

"He struck me on two other occasions, once in about February, 1936. His brother and his wife and little daughter came over for the evening at our home; when they entered the door, Mr. Stuart said, 'I am going to see if I have a flat tire,' and he left and they went downstairs, and they were gone about two hours, and my sister-in-law was becoming restless, because her little girl should have been in bed, and she didn't have carfare to go home. When they came back I asked him if he had a flat tire, and he was very nasty, and so he walked over to the table and got a cigarette, and I asked him if he would please give me one, and he swore at me and told me to get my own, and I repeated what he said to me, and he came over and slapped me. My girl friend jumped up. She was there. And he went over and knocked her down, and then he came back and knocked me around the room in general.

"He knocked me against the windows and the floor and the furniture. I had bruises on my body but not like the last time. He bruised me badly. He slapped me across the face, and then he hit me in the body with his fist.

"He also struck me in March, 1940. He got mad, and I went into the baby's room and locked the door, and he came in—he broke the door down.

"He knocked me around in the long hall at the back of the house until the people next door came over. They were out there debating whether they should come over, and he finally went in and asked this neighbor woman to come in before he killed me.

"He knocked me down in the hall there. I had bruises. I don't believe I gave him reason to treat me that way. He was raging because I wanted to go downtown with a friend of mine. He had no reason to object to this. He also called my grandfather and told him to get my mother, who was at a party, to come over and get me right away, or he would kill me.

"We separated on both of those other occasions.

Then he would come back and plead with me to come back and that he would change, and could and would make me happy, and do things that I wanted him to, and promise to treat me better, that our way of living would be better and he would do everything to make me happy. He never did the things he promised. He would revert to his old ways.''

Mary Cathleen Brown testified:

''I observed his treatment of her and sometimes he treated her all right and at other times he did not. On one occasion, while I was there, he beat her up and knocked me down.

''Quite often he would fly into a temper at the least little thing. I and Betty would be talking, and he would lose his temper and swear at us and not act like a normal man. That happened more than five times.''

Marie Gooley testified:

''I lived next door to Mr. and Mrs. Stuart for a couple of years. I was acquainted with them, and had an opportunity to observe their conduct toward each other. He would get very cross with her.

''In 1935 and 1936, or 1937, I heard her scream and heard a rap on our back door and it was her husband who came over to ask my husband to defend her because he was going to do something to her.

''My husband went over. The bathroom door was locked and he broke the door. The door was broken. I don't think Mrs. Stuart was bruised, but she seemed to be crying and screamed for us. Mr. Stuart asked us to come over before he did do something violent to her.

''Mr. Stuart seemed excited.

''On other occasions, I have not seen him act quite that bad, but I often heard them quarreling, on other occasions, quite frequently.''

The defendant by his testimony minimizes his conduct but admits striking plaintiff. It appears that intoxication is the principal cause of his violence toward her. He has been given several opportunities to amend and pointedly shown by the separations what the result of his violence must necessarily be on the future of his marriage relation, but to no avail. That his wife does not now love him nor care to live with him is the simple and direct result of his own violence. He complains of her being in the company of other men. Her conduct is not approvable but we consider her ill conduct not sufficient to prevent her being awarded the decree.

At the conclusion of the hearing on June 10, 1943, the court after making a resume of the facts and after discussion with counsel which is not of record, announced an adjournment of the matter for six months to afford the parties further time to effectuate a reconciliation. On January 26, 1944, more testimony was taken, and it then appeared clearly that a reconciliation was impossible so far as plaintiff is concerned.

The provision for the children's support under the heading of "alimony" in the decree appealed from requires defendant to pay $275 per month for the support of the two children, of which $175 is to be presently used and $100 is to be retained in the hands of the friend of the court for indefinite future needs. The statute, 3 Comp. Laws 1929, § 12738, as amended by Act No. 134, Pub. Acts 1939 (Comp. Laws Supp. 1940, § 12738, Stat. Ann. 1944 Cum. Supp. § 25.96), authorizes the requirement of a bond to assure payments of allowance for children, but does not expressly authorize the requirement of monthly payments into a trust fund. No authority is cited as precedent therefor.

The provision of $100 per month to be paid by plaintiff to the friend of the court for the trust fund is stricken out of the decree; the requirement for payment of $175 per month is to remain. A decree will be entered by this Court affirming the decree appealed from, modified to conform with this opinion, and remanding the cause to the circuit court to enforce the modified decree and entertain proceedings for subsequent modification of the decree, with costs to plaintiff.

STARR, C. J., and NORTH, WIEST, BUTZEL, BUSH-NELL, SHARPE, and BOYLES, JJ., concurred.